**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARY CARTER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. |
| v. | ) ) | |
| ATWOOD OCEANICS, INC., ROBERT J. SALTIEL, GEORGE DOTSON, JACK GOLDEN, HANS HELMERICH, JEFFREY A. MILLER, JAMES MONTAGUE and PHIL D. WEDEMEYER | ) ) ) ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) ) ) | |

Plaintiff Mary Carter ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Atwood Oceanics, Inc., ("Atwood" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Atwood, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between Atwood and Ensco plc ("Ensco").

2.      On May 29, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to

receive 1.60 shares of Ensco Class A ordinary shares for each share of Atwood stock they own (the "Merger Consideration").

3.      On June 16, 2017, in order to convince Atwood shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Preliminary Joint Proxy Statement (the "Proxy")[1] with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company and Ensco; and (ii) the valuation analyses performed by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"), in support of their fairness opinion.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100.  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Atwood

---

[1]      The Proxy was contained within a Form S-4 Recommendation Statement filed by Ensco.

shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Atwood maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11. Plaintiff is, and at all relevant times has been, an Atwood shareholder.

12. Defendant Atwood is an offshore drilling company incorporated in the State of Texas. The Company's principal place of business is located at 15011 Katy Freeway, Suite 800

Houston, Texas 77094.

13.    Individual Defendant Robert J. Saltiel ("Saltiel") has served as a President, Chief Executive Officer since December 2009 and director of Atwood since February 2010.

14.    Individual Defendant George S. Dotson ("Dotson") has served as a director of Atwood since February 1988.

15.    Individual Defendant Jack E. Golden ("Golden") has served as a director of Atwood since September 2009.

16.    Individual Defendant Hans Helmerich ("Helmerich") has served as a director of Atwood since February 1989.

17.    Individual Defendant Jeffrey A. Miller ("Miller") has served as a director of Atwood since March 2013.

18.    Individual Defendant James R. Montague ("Montague") has served as a director of Atwood since June 2006.

19.    Individual Defendant Phil D. Wedemeyer ("Wedemeyer") has served as a director of Atwood since October 2011.

## CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Atwood (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

21.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. As of May 26, 2017, there were approximately 80,519,422 shares of Atwood common stock

- 4 -

outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of Atwood will be ascertained through discovery;

b.　　There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)　　whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)　　whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)　　whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.　　Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.　　Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.　　The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual

members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.    The Merger Consideration Appears Inadequate in Light of Atwood's Recent Financial Performance and Growth Prospects**

22.    Atwood is an offshore drilling company. The Company is engaged in the drilling and completion of exploration and development wells for the global oil and gas industry. The Company owns various types of drilling rigs, such as Ultra-deepwater Rigs, Deepwater Semisubmersibles and Jackups. The Company's Ultra-deepwater Rigs and Deepwater Semisubmersibles include Atwood Achiever, Atwood Archer, Atwood Admiral, Atwood Advantage, Atwood Condor, Atwood Eagle and Atwood Osprey.

23.    On May 30, 2017, the Company and Ensco issued a joint press release announcing the Proposed Merger, which states in pertinent part:

> LONDON & HOUSTON--(BUSINESS WIRE)-- Ensco plc (NYSE: ESV) and Atwood Oceanics, Inc. (NYSE: ATW) jointly announced today that they have entered into a definitive merger agreement under which Ensco will acquire Atwood in an all-stock transaction. The definitive merger agreement was unanimously approved by each company's board of directors.
>
> Under the terms of the merger agreement, Atwood shareholders will receive 1.60 shares of Ensco for each share of Atwood common stock for a total value of $10.72 per Atwood share based on Ensco's closing share price of $6.70 on 26 May 2017. This represents a premium of approximately 33% to Atwood's closing price on the same date. Upon close of the transaction, Ensco and Atwood shareholders will own

approximately 69% and 31%, respectively, of the outstanding shares of Ensco plc. There are no financing conditions for this transaction.

Ensco expects to realize annual pre-tax expense synergies of approximately $65 million for full year 2019 and beyond. The combination is expected to be accretive on a discounted cash flow basis.

Ensco Chief Executive Officer Carl Trowell said, "The combination of Ensco and Atwood will strengthen our position as the leader in offshore drilling across a wide range of water depths around the world – creating a broad platform that we can build upon in the future. This acquisition significantly enhances our high-specification floater and jackup fleets, adding technologically advanced drillships and semisubmersibles, and refreshing our premium jackup fleet to best position ourselves for the market recovery. We believe that the purchase price for these assets represents a compelling value to our shareholders, which is augmented further by expected synergies from the transaction."

Mr. Trowell added, "By bringing together our high-specification rig fleets, technology and innovation, and talented rig crews, we plan to continue delivering high levels of operational and safety performance to an even larger group of clients. We will remain one of our industry's best capitalized companies. Our combined financial strength, diverse customer base and larger scale should lead to greater strategic and competitive advantages as well as cost efficiencies, allowing for opportunistic investments through the market cycle."

Atwood's Chief Executive Officer Rob Saltiel stated, "The combination is an ideal strategic fit. Both companies are passionate about operational excellence, safety and customer satisfaction with core values and cultures that are perfectly aligned. We believe the combined company will offer an unmatched rig fleet and workforce. These attributes, anchored by a strong balance sheet, should enable the company to thrive as market conditions improve and allow Atwood shareholders to fully participate in the market recovery."

**Strategic Fit**

The transaction will join two leading offshore drillers – combining long-established histories of operational, safety and technical expertise with high-quality assets that cover the world's most prolific offshore drilling basins.

The acquisition will strengthen Ensco's position as the leading offshore driller with exposure to deep- and shallow-water markets that span six continents. Upon closing, Ensco will add six ultra-deepwater floaters, including four of the most capable drillships in the industry, and five high-specification jackups. The combined company will have a fleet of 63 rigs, comprised of ultra-deepwater drillships, versatile deep- and mid-water semisubmersibles and shallow-water jackups, along with a diverse customer base of 27 national oil companies,

supermajors and independents.

**Combined Company Highlights**

The combined company's fleet will be among the most technologically advanced in the industry and will meet the deep- and shallow-water drilling requirements of an expanded base of clients around the world. Within the fleet of 26 floating rigs (semisubmersibles and drillships) are 21 ultra-deepwater drilling rigs, capable of drilling in water depths of 7,500′ or greater, with an average age of five years – establishing this fleet among the youngest and most capable in the industry.

The jackup fleet will be the largest in the world, composed of 37 rigs, including 27 premium units. These jackups are all equipped with many of the advanced features requested by clients for shallow-water drilling programs, such as increased leg length, expanded cantilever reach, greater hoisting capacity and offline handling capabilities.

The combined company will be among the most geographically diverse drillers with current operations and drilling contracts spanning six continents in nearly every major deep- and shallow-water basin around the world. Regions will include major markets such as the Gulf of Mexico, Brazil, West Africa, Middle East, North Sea, Mediterranean and Asia Pacific.

Customers will include most of the leading national and international oil companies, plus many independent operators. In total, the combined company will benefit from a diversified client base with the largest number of current customers of any offshore driller.

Ensco's executive management will continue with Carl Trowell as President and Chief Executive Officer, Carey Lowe as Executive Vice President and Chief Operating Officer, and Jon Baksht as Senior Vice President and Chief Financial Officer.

Ensco plc's Chairman will continue to be Paul Rowsey and the board of directors will include Carl Trowell, plus two members from Atwood's current board effective at closing.

Ensco will continue to be domiciled in the UK and senior executive officers will be located in London and Houston. Ensco plc shares will continue to trade on the New York Stock Exchange under the symbol "ESV".

**Financial Highlights**

Future revenue growth opportunities are anticipated with an expanded fleet serving a larger customer base across a wide geographic footprint. While current market conditions are challenging, Ensco will be ideally positioned to meet increasing

levels of customer demand as the market recovers.

Annual expense savings of $65 million are estimated to be realized in full year 2019 and beyond, and 2018 cost synergies are projected to be more than $45 million. Expense savings are anticipated from the consolidation of offices that include corporate staff departments and shore-based operations in overlapping markets, as well as the standardization of systems, policies and procedures across the organization.

Based on the anticipated annual savings, the planned combination is expected to be accretive to projected discounted cash flows.

The balance sheet of the combined company will remain strong. Adjusted for the expected retirement of Atwood's outstanding revolving credit facility with cash and short-term investments on hand, total available liquidity was $3.9 billion on 31 March 2017 and included $1.6 billion of cash and short-term investments.

The estimated enterprise value of the combined company is $6.9 billion, based on the closing price of each company's shares on 26 May 2017. The combined company will have approximately $3.7 billion in revenue backlog.

24.     The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth.  Indeed, in the first quarter ended December 31, 2016, the Company reported net income of $9.7 million and revenues of $157.6 million. The Company's fleet revenue efficiency for the first quarter was approximately 96 percent, with no significant downtime events. The Company also reported that their rig teams continue to deliver reliable drilling services to their clients due to the disciplined maintenance and testing of their subsea blow-out preventers.

25.     The Company's success continued into the following quarter. Commenting on the results of the second quarter ended March 31, 2017, the Company's Chief Financial Officer, Mark W. Smith stated:

The company generated quarterly revenues of $168 million on 273 operating days, versus $158 million on 374 operating days in the previous quarter. The increase in revenue is primarily related to the Atwood Achiever, as the client exercised its option to revert the day rate back to the higher original contracted rate in term beginning in early February. As disclosed in the previous earnings call, the exercise

of this option resulted in a one-time make-whole payment of $48.1 million recognized this quarter.

Once again, our fleet performed very well, with excellent revenue efficiency of 99.5%. We recognized a noncash impairment related to the Atwood Eagle of $57.6 million net of tax or $0.74 per diluted share in the second quarter. This impairment charge includes a pre-tax write-down of property and equipment and deferred costs of $49.6 million to salvage value, a write-down of materials and supplies inventory specific to this rig of $8.4 million.

26. The value of the Proposed Merger results in $10.72 per Atwood share based on Ensco's closing share price of $6.70 on May 26, 2017. This represents a 30% discount of Atwood's 52-week high of $15.37.

27. In sum, it appears that Atwood is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

## II. The Materially Incomplete and Misleading Proxy

28. On June 16, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

29.     First, the Proxy fails to provide material information concerning the Company's financial projections.  Specifically, the Proxy provides non-GAAP (generally accepted accounting principles) projections, EBITDA and Unlevered Free Cash Flows ("UFCF"), but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures. As to EBITDA, the Proxy fails to disclose: (i) earnings before interest, (ii) income taxes and (iii) depreciation and amortization. As to UFCF, the Proxy fails to disclose: (i) capital expenditures; (ii) taxes; (iii) changes in net working capital; and (iv) proceeds from disposal of assets. Proxy, 87.

30.     Similarly, the Proxy fails to provide material information concerning the Ensco's financial projections. The Board's reliance on Ensco's projections is clear as the Proxy discloses that "the Ensco financial forecasts were provided to. . .Atwood and Goldman Sachs." Proxy, 84. However, as to EBITDA, the Proxy fails to disclose: (i) earnings before interest, (ii) income taxes and (iii) depreciation and amortization. As to UFCF, the Proxy fails to disclose: (i) capital expenditures; (ii) taxes; (iii) changes in net working capital; (iv) proceeds from disposal of assets; and (v) mobilization costs. Proxy, 87-88.

31.     Third, the Proxy discloses pro forma financial projections of the Proposed Merger (the "Combined Company Forecasts"). However, the Combined Forecasts suffer the same flaw as the two aforementioned sets of projections. The Proxy fails to disclose: (i) earnings before interest; (ii) income taxes; (iii) depreciation and amortization. As to UFCF, the Proxy fails to disclose: (i) taxes; (ii) capital expenditures; (iii) mobilization costs; (iv) proceeds from disposal of assets; and (v) changes in net working capital. Proxy, 88-89.

32.     The failure to disclose this material information renders the Board's unanimous recommendation in favor of the Proposed Merger to shareholders false and misleading. Proxy at

62 ("The Atwood Board considered all of these factors as a whole and, on balance, concluded that they supported a determination to approve the merger agreement.")

33.     In order to make the projections for Atwood and Ensco included on pages 87-89 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

34.     At the very least, the Defendants must disclose the line item projections for the financial metrics that were used to calculated the non-GAAP measures for the Company, Ensco and the Combined Company Forecasts.  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading.  Indeed, the Defendants acknowledge that disclosing non-GAAP projections may mislead shareholders in the Proxy: "Certain of the measures included in the forward-looking financial information may be considered non-GAAP financial measures, as noted below. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by Atwood are not reported by all of Atwood's competitors in the offshore drilling industry and may not be comparable to similarly titled amounts used by other companies." Proxy, 86.

35.     When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

36.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP

financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo

White, recently stated that the frequent use by publicly traded companies of unique company-

specific non-GAAP financial measures (as Atwood and Ensco included in the Proxy here),

implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the
> GAAP information, has become the key message to investors, crowding out and
> effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief
> Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation
> Finance and I, along with other members of the staff, have spoken out frequently
> about our concerns to raise the awareness of boards, management and investors.
> And last month, the staff issued guidance addressing a number of troublesome
> practices *which can make non-GAAP disclosures misleading*: the lack of equal or
> greater prominence for GAAP measures; exclusion of normal, recurring cash
> operating expenses; individually tailored non-GAAP revenues; lack of consistency;
> cherry-picking; and the use of cash per share data.  I strongly urge companies to
> carefully consider this guidance and revisit their approach to non-GAAP
> disclosures.  I also urge again, as I did last December, that appropriate controls be
> considered and that audit committees carefully oversee their company's use of non-
> GAAP measures and disclosures.[2]

37.     Last year, the SEC has repeatedly emphasized that disclosure of non-GAAP

projections can be inherently misleading, and has therefore heightened its scrutiny of the use of

such projections.[3]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released

new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP

---

[2]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual
Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-
GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-
speech.html.

[3]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's
Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation
(June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-
secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into
Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-
is-helping-companies-spin-losses-into-profits.html?_r=0.

financial measures that demonstrate the SEC's tightening policy.[4] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

38. The Proxy also omits certain key inputs necessary for shareholders to assess the valuation analyses performed by Goldman Sachs in support of their fairness opinion, rendering the summaries of such analyses in the Proxy incomplete and misleading.

39. As to Goldman Sachs' Illustrative Discounted Cash Flow Analysis – 5-year DCF Model – Atwood Standalone, the Proxy fails to disclose: (i) the inputs and assumptions underlying the discount rates ranging from 13.0% to 15.0%; (ii) the range of illustrative terminal values for Atwood; (iii) Atwood's net debt; and (iv) the number of fully diluted outstanding shares of Atwood provided by the management of Atwood. Proxy, 78-79.

40. As to Goldman Sachs' Illustrative Discounted Cash Flow Analysis – 5- year DCF Model – Ensco Standalone, the Proxy fails to disclose: (i) the inputs and assumptions underlying the discount rates ranging from 12.0% to 14.0%; (ii) the range of illustrative terminal values for Ensco; (iii) Ensco's net debt; and (iv) the number of fully diluted outstanding shares of Ensco provided by the management of Atwood. Proxy, 79.

41. As to Goldman Sachs' Illustrative Discounted Cash Flow Analysis – 5-year DCF Model – Pro Forma, the Proxy fails to disclose: (i) the inputs and assumptions underlying the discount rates ranging from 12.0% to 14.0%; (ii) the range of illustrative terminal values for the combined company; (iii) the calculated terminal year estimate of EBITDA to be generated by the combined company; (iv) the pro forma net debt; and (v) the number of estimated pro forma fully

---

[4] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

diluted outstanding shares of the combined company following closing as provided by the management of Atwood. Proxy, 79-80.

42.    As to Goldman Sachs' Illustrative Discounted Cash Flow Analysis – Asset Life Model – Atwood Standalone, the Proxy fails to disclose: (i) the inputs and assumptions underlying the discount rates ranging from 13.0% to 15.0%; (ii) Atwood's net debt; and (iii) the number of fully diluted outstanding shares of Atwood provided by the management of Atwood. Proxy, 80.

43.    As to Goldman Sachs' Illustrative Discounted Cash Flow Analysis – Asset Life Model – Ensco Standalone, the Proxy fails to disclose: (i) the inputs and assumptions underlying the discount rates ranging from 12.0% to 14.0%; (ii) Ensco's net debt; and (iii) the number of fully diluted outstanding shares of Ensco provided by the management of Atwood. Proxy, 80.

44.    As to Goldman Sachs' Illustrative Discounted Cash Flow Analysis – Asset Life Model – Pro Forma, the Proxy fails to disclose: (i) the inputs and assumptions underlying the discount rates ranging from 12.0% to 14.0%; (ii) the pro forma net debt; and (iii) the number of pro forma fully diluted outstanding shares provided by the management of Atwood. Proxy, 80-81.

45.    The failure to disclose this material information renders Goldman Sachs' opinion that the Proposed Merger was fair, and the equity value ranges included in Goldman Sachs' analyses on pages 78-81 of the Proxy materially complete and misleading. These key inputs are material to Atwood shareholders, and their omission renders the six summaries of Goldman Sachs' Illustrative Discounted Cash Flow Analysis incomplete and misleading.

46.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

47.    In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## <u>COUNT I</u>

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

48.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

50.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

51.    SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*."  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

52.    The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

53.    Defendants have issued the Proxy with the intention of soliciting shareholder

support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company and Ensco; and (ii) the valuation analyses performed by Goldman Sach in support of their fairness opinion.

54. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

55. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that Goldman Sachs reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Goldman Sachs as well as its fairness opinion and the assumptions made and matters considered in connection therewith.

56. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Goldman Sachs' analyses in connection with their receipt of the fairness

opinion, question Goldman Sachs as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

57.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

58.     Atwood is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

59.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

60.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of
### Section 20(a) of the Exchange Act)

61.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of Atwood within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Atwood, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

63.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

65.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

66.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

67.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

68.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 30, 2017

Respectfully submitted,

**KENDALL LAW GROUP, PLLC**

By: _/s/ Joe Kendall_
Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
Jamie J. McKey
Texas Bar No. 24045262
jmckey@kendalllawgroup.com
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (214) 744-3000
Facsimile: (214) 744-3015

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**

Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Attorney for Plaintiff*

*Counsel for Plaintiff*